*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0634**

State of Minnesota,
Respondent,

vs.

Arthur Dale Senty-Haugen,
Appellant.

**Filed March 14, 2016
Affirmed
Chutich, Judge**

Carlton County District Court
File No. 09-CR-13-591

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Thomas Pertler, Carlton County Attorney, Jesse D. Berglund, Assistant County Attorney, Carlton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sharon E. Jacks, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Bjorkman, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant Arthur Dale Senty-Haugen challenges the district court's denial of jail credit for time he spent under internal sanctions while committed to the Minnesota Sex

Offender Program. He additionally argues in his pro se supplemental brief that the district court incorrectly calculated his criminal-history score. Because he is not entitled to credit under Minnesota law and because the district court did not abuse its discretion in calculating his criminal-history score, we affirm his sentences.

## FACTS

This appeal arises from Arthur Senty-Haugen's conviction and sentence for financial-transaction-card fraud and two counts of fifth-degree assault, to which he pleaded guilty. Senty-Haugen is a client of the Minnesota Sex Offender Program, where he has been indefinitely civilly committed since March 1996.

In August 2012, D.H., another program client, reported to the sex-offender program's Office of Special Investigations that Senty-Haugen used D.H.'s personal information to obtain two credit cards. The investigation confirmed that Senty-Haugen used the credit cards to incur over $10,000 in unauthorized charges. In March 2013, the state charged him with three counts each of identity theft and financial-transaction-card fraud. *See* Minn. Stat. §§ 609.527, subd. 2, 609.821, subd. 2(1) (2012).

In late June 2014—while the identity-theft and financial-transaction-card-fraud charges were still pending—Senty-Haugen intervened during an argument between a fellow program client and two staff members, ultimately punching both staff persons. Senty-Haugen was immediately placed in protective isolation, was soon arrested, and spent less than a week in the local jail. The state later charged him with two counts of fourth-degree assault. *See* Minn. Stat. § 609.2231, subd. 3a(b)(1) (2012). Upon his return from jail, he was relocated to the sex-offender program's behavioral-therapy unit, Omega,

2

pending resolution of the charges. The record shows that he spent up to three weeks each on Omega 1 and 3 and at least nine weeks on Omega 2 before being transferred to the Carlton County jail in December 2014.

In August 2014, Senty-Haugen pleaded guilty to financial-transaction-card fraud under an agreement with the state that he would be sentenced to no more than 19 months and the remaining March 2013 charges would be dropped. He also pleaded guilty to the two assault charges, which were amended to fifth-degree assault, and stipulated to sentences that would run concurrently with the financial-transaction-card-fraud sentence.

The district court sentenced Senty-Haugen to 19 months for financial-transaction-card fraud and 90 days for each fifth-degree-assault charge, with all three sentences to run concurrently. In announcing the precise sentence, the district court credited him with 42 days for his incarceration in local jail before sentencing but denied him credit for any time spent under the sex-offender program's internal sanctions.

The district court additionally rejected Senty-Haugen's challenge to his criminal-history score, concluding that it had been correctly calculated. Senty-Haugen appeals.

**D E C I S I O N**

**I.      Jail Credit**

The Minnesota Rules of Criminal Procedure provide that, upon a criminal defendant's sentencing, the district court shall grant credit for time spent "in custody in connection with the offense . . . being sentenced." Minn. R. Crim. P. 27.03, subd. 4(B). "The decision to award custody credit is not discretionary with the district court." *State v. Johnson*, 744 N.W.2d 376, 379 (Minn. 2008) (citing Minn. R. Crim. P. 27.03, subd. 4(B)).

3

"'Awards of jail credit are governed by principles of fairness and equity and must be determined on a case-by-case basis.'" *State v. Arend*, 648 N.W.2d 746, 748 (Minn. App. 2002) (quoting *State v. Bradley*, 629 N.W.2d 462, 464 (Minn. App. 2001), *review denied* (Minn. Aug. 15, 2001)). The "defendant bears the burden of establishing that [he] is entitled to jail credit." *State v. Garcia*, 683 N.W.2d 294, 297 (Minn. 2004). "A district court's decision whether to award credit is a mixed question of fact and law; the court must determine the circumstances of the custody the defendant seeks credit for, and then apply the rules to those circumstances." *Johnson*, 744 N.W.2d at 379. We review the district court's factual findings for clear error, and we review the interpretation of the rules of criminal procedure de novo. *Id.*

### Sentencing-Hearing Testimony

Before sentencing Senty-Haugen, the district court heard motions and testimony regarding the calculation of his jail credit. Senty-Haugen and Connie Proctor, a compliance and due-process specialist at the sex-offender program, each testified regarding the conditions of his commitment from August 2012 to December 2014.

According to Senty-Haugen, program residents are housed in general treatment and living units, where they may participate in activities and move freely throughout the facility. Throughout the pendency of the case, he was assigned to unit 1C, a general-treatment living unit.

Proctor described heightened security measures that the program imposes in response to certain client conduct. The first, the High Security Area, is a non-punitive, restricted area with locked doors, so a client "cannot exit of his or her own accord." The

4

program uses the High Security Area to hold "clients who are out of behavioral control or who have been alleged to have committed a crime [that] violates the safety and security of the facility and the other clients and staff." On average, clients stay in the High Security Area for no more than 24 hours, provided they are back under behavioral control. Senty-Haugen described the High Security Area as "the most restrictive unit." In the High Security Area, he testified, clients are "given clothes very similar to county jail," "not allowed any property," and clients are allowed one half-hour break outside their rooms for hygiene and one half-hour break for leisure in a "caged area."

The next heightened security measure Proctor described, the Omega unit, is a "behavioral-therapy unit" with three levels; levels one and two are the most restrictive, and level three is the least restrictive. Proctor testified that placement on the Omega unit is not considered punitive but is used "if a client is unable to or unwilling to control their behavior in order to live on a larger unit, or if a client refuses to follow the rules of the facility." Under such circumstances, "oftentimes a client will be placed on Omega so that they can get individual therapy from a clinical standpoint." Placement on the Omega unit can last anywhere from one week to several months but is not intended to be a permanent living assignment.

Senty-Haugen explained that Omega 3 is a 25-bed unit. Depending on a particular client's administrative restrictions, an Omega 3 resident's access to programming can be restricted because of his or her confinement to the unit. Omega 2 is a four-person unit, with each client individually housed in a cell similar to those in county jail; access to personal property is restricted to only hygiene-related items, clothing, and stationery.

5

Senty-Haugen noted that Omega 2 residents cannot place canteen orders, may have only non-contact visits, may have only one hour of recreation per week, and may have one half hour "outside in a caged area." Omega 1 is similar to Omega 2, with less activity. According to Senty-Haugen, Omega 1 clients are allowed "one less hour of rec and there's no TV and the property is the same. You could only have one bin of clothing and stationery and things like that. You have very limited contact with anybody."

Proctor testified that another enhanced security measure is administrative restriction, which is used "when a particular client is either being investigated of a crime or is awaiting sentencing, or is awaiting transfer to a DOC facility." *See* Minn. Stat. § 253D.02, subd. 2 (2014) (defining administrative restriction and noting that it "may include increased monitoring, program limitations, loss of privileges, restricted access to and use of possessions, and separation of a committed person from the normal living environment"). She noted that clients may be placed on the Omega unit while simultaneously under administrative restriction and particular conditions are prescribed on a plan-by-plan basis.

To support his calculation of jail credit, Senty-Haugen testified about changes in his confinement. According to Senty-Haugen, once the Office of Special Investigations began investigating the credit-card fraud, program officials placed him on administrative restriction and relocated him to Omega 3 for 90 days.[1] The parties agreed that once Senty-

---

[1] Consistent with this assertion, the fraud-investigation report states that the investigator informed Senty-Haugen of the allegations on September 7, 2012, in the Omega unit team room. But the record also shows that Senty-Haugen incurred at least two behavioral-

6

Haugen was arrested for the June 24, 2014 assault charges, program officials relocated him to the Omega unit pending resolution of the charges. Independent of the criminal charges, however, Senty-Haugen received approximately 15 behavioral-expectation reports between August 2012 and December 2014 that warranted enhanced restrictions.[2]

The district court concluded that Senty-Haugen had not established that he was entitled to jail credit for the time spent on "the restrictions, the time [he] spent in any of the Omega programs, the other restrictions — or as a result of other restrictions imposed during [his] time at [the sex-offender program]." It awarded him 42 days of jail credit, however, for the time he spent in the county jail.

Senty-Haugen argues that the district court erred by denying him credit for the time his liberty was further restricted at the sex-offender program because of the criminal charges. Relying on *State v. Johnson*, he asserts that, because the terms of his confinement were altered because of the criminal charges, he is entitled to credit. Specifically, for the financial-transaction-card-fraud offense, Senty-Haugen contends that he should receive credit beginning October 25, 2012, or "the date the investigation was complete and probable cause existed," totaling 770 days. For the assault offenses, he maintains that he should be credited for 90 days. His arguments are unavailing.

---

expectations reports in his assigned living unit during this 90-day period, suggesting that he was still residing in a general treatment living unit and not in the Omega unit.

[2] For example, documentation of Senty-Haugen's placement showed that he was in the High Security Area (1) on July 22, 2013, for receiving contraband in the mail; (2) on December 4, 2013, for alleged threats to local authorities; and (3) on August 12, 2014, for prohibited cellphone use.

In *Johnson*, the defendant was arrested for making terroristic threats against hospital staff while he was civilly committed as a sex offender at the Minnesota Security Hospital in Saint Peter. 744 N.W.2d at 378. Around the time that the state charged him for the offenses, Johnson was transferred to the sex-offender program in Moose Lake for reasons apparently unrelated to the charges. *Id.* Upon sentencing, he requested credit for the time spent at the Moose Lake facility after his transfer. *Id.*

The supreme court cited the jail-credit rule, which entitles offenders to credit for time spent (i) in custody (ii) in connection with the offense. *Id.* at 379 (citing Minn. R. Crim. P. 27.03, subd. 4(B)). It stated that "[t]he policy behind giving custody credit is to ensure fairness and proportionality in sentencing." *Id.* Among other potential concerns, it noted that the rule seeks to prevent a "de facto conversion of a concurrent sentence into a consecutive sentence." *Id.*

Applying the rule to the facts in *Johnson*, the supreme court concluded that the sex-offender program is "without dispute the functional equivalent of a jail," thus establishing the in-custody element. *Id.* at 380. It further concluded, however, that Johnson had not established the in-connection-with element, because he failed to show that the terms of his confinement were altered *because of* the criminal charges. *Id.* Johnson's confinement at the program was not a condition of his criminal sentence nor a condition of probation; rather, he was "in a secure treatment facility for purposes of treatment." *Id.* Even if Johnson could have established that his "sentence to confinement in a correctional facility delayed his sex offender treatment program . . . his civil commitment [was] indefinite. The sentence without custody credit [did] not prolong Johnson's confinement and therefore

8

[did] not serve as a de facto consecutive sentence." *Id.* And "the simple fact of the transfer [was] insufficient to indicate custody separate from civil commitment." *Id.*

Like *Johnson*, the focus of our analysis here is the in-connection-with element of the jail-credit rule. Consistent with Senty-Haugen's argument, we agree that his sex-offender-program file reflects certain changes in the terms of his confinement related to the criminal charges. Indeed, administrative restriction is authorized by statute under such circumstances. *See* Minn. Stat. § 253D.02, subd. 2. The sentencing-hearing testimony shows that the Omega unit is undoubtedly more restrictive than Senty-Haugen's previously assigned living unit.

*Johnson*'s analysis makes clear, however, that to establish the in-connection-with element of the jail-credit rule, the terms of an offender's confinement must be altered as the result of a condition of probation or in compliance with a criminal sentence. *Johnson*, 744 N.W.2d at 380; *see also Asfaha v. State*, 665 N.W.2d 523, 528 (Minn. 2003) (crediting time spent in residential treatment facility as a condition of probation); *State v. Razmyslowski*, 668 N.W.2d 681, 684 (Minn. App. 2003) (crediting time spent at intensive sex-offender treatment program ordered as a condition of probation). Nothing in the record before us suggests that Senty-Haugen's confinement to the Omega unit or his administrative-restriction status met such criteria. Accordingly, we conclude that the heightened restrictions under which Senty-Haugen was placed were not imposed in connection with the criminal charges, as the supreme court interpreted that provision in *Johnson*, and we decline to extend the grant of jail credit to the internal sanctions that he experienced in the sex-offender program.

9

Moreover, even if any of the heightened restrictions were imposed in connection with the criminal charges as the supreme court has applied that phrase, Senty-Haugen has not discharged his burden of showing that he is entitled to credit for 770 days in connection with the financial-transaction-card-fraud charge. Proctor testified that the documentation of Senty-Haugen's restrictions was complete, yet nothing in Senty-Haugen's file documented his assertion that he was placed on administrative-restriction status following the August 2012 investigation. The only mention of the fraud charges in his record of administrative-restriction status appears in the plan-review documents drafted in September 2014 and later. Moreover, despite his claim that he was placed on Omega 3 for 90 days in response to the financial-transaction-card-fraud investigation, the record does not support this contention. In fact, the treatment records show that he received behavioral reports for rule violations in his assigned living unit numerous times throughout that period, including August 21, 2012, and October 27, 2012. And even when Senty-Haugen was assigned to the Omega unit after he punched staff persons in June 2014, his restrictions were increased because he was caught with a cellphone, a rules violation.

In sum, Senty-Haugen is not entitled to credit for the time he spent under internal sanctions at the sex-offender program before he was transported to jail in connection with these criminal charges. Thus, the district court did not err in calculating the custody credit.

## II.      Criminal-History Score

This court reviews a district court's determination of a defendant's criminal-history score for abuse of discretion. *State v. Stillday*, 646 N.W.2d 557, 561 (Minn. App. 2002), *review denied* (Minn. Aug. 20, 2002). We review the interpretation of the Minnesota Sentencing Guidelines, a question of law, de novo. *State v. Maurstad*, 733 N.W.2d 141, 148 (Minn. 2007). When interpreting a certain provision, "we shall not disregard the plain and unambiguous language of the sentencing guidelines and accompanying commentary." *State v. Mondry*, 682 N.W.2d 183, 184 (Minn. App. 2004).

The sentencing guidelines provide that an offender's criminal-history score is computed by assigning points for "each [prior] felony conviction, provided that a felony sentence was stayed or imposed before the current sentencing or a stay of imposition of sentence was given before the current sentencing." Minn. Sent. Guidelines 2.B.1 (2014). If, however, "multiple offenses arising from a single course of conduct involving multiple victims were sentenced, [the district court must] include in criminal history only the weights from the two offenses at the highest severity levels." Minn. Sent. Guidelines 2.B.1.d (2) (2014). Offenses under severity-level two receive one half point and those between severity levels three and five receive one point. Minn. Sent. Guidelines 2.B.1.a (2014).

To determine whether offenses stem from a single course of conduct, we should "analyze all the facts and determine whether the offenses arose out of a continuing and uninterrupted course of conduct, manifesting an indivisible state of mind or coincident errors of judgment." *State v. Gibson*, 478 N.W.2d 496, 497 (Minn. 1991) (quotation

11

omitted). When the crimes charged are intentional, "we focus on factors such as time and place and whether the conduct involved was motivated by an effort to obtain but one criminal objective." *Id.* (noting that "multiple sentences may not be used for two offenses if the defendant[] substantially contemporaneously committed the second offense in order to avoid apprehension for the first offense").

Before sentencing, the presentence investigation calculated Senty-Haugen's criminal-history score to be eight, which reflected four convictions from 2000 consolidated into a single complaint (3.5 points) and six federal convictions from 2005 consolidated into a single complaint (5 points). At the sentencing hearing, the district court denied Senty-Haugen's request to recalculate his criminal-history score, concluding that eight was correct.

In his pro se supplemental brief, Senty-Haugen argues that the district court assigned the wrong severity level to the convictions from 2000 by applying the severity levels at the time of sentencing and not at the time of the offense. He next asserts that the four convictions from 2000 and the six convictions from 2005 each stemmed from single courses of conduct, because he committed the subsequent offenses in an attempt to avoid apprehension. He maintains that only the two offenses at the highest severity level within both sets of convictions warrant criminal-history points. His arguments are without merit.

First, even if the presentence investigation applied the sentencing guidelines in effect at the time of sentencing, the relevant offense-severity levels and the corresponding criminal-history points have not changed since the time the offenses were committed.

12

*Compare* Minn. Sent. Guidelines II.B.1.a (1996), *and* Minn. Sent. Guidelines II.B.1.a (1998), *with* Minn. Sent. Guidelines 2.B.1.a (2014).

Next, his arguments regarding his prior convictions fail because, even assuming that the avoidance-of-apprehension doctrine applies, his testimony at sentencing and his description of the offenses belie this interpretation. He testified at the sentencing hearing that the six federal convictions involved fraudulent tax returns over several years, for which he submitted over 100 documents, created several LLC corporations, and filed under a different business name each year. He described the convictions from 2000 as a chain of events beginning with charges incurred on a credit card obtained under the name of another sex-offender program client in 1996, $31,268 in charges incurred through early 1997, later theft by swindle of a gold coin, and fraudulent withdrawal of $17,122 from another's bank account in 1999.

The length of time between the incidents consolidated into each complaint illustrates that they did not occur substantially contemporaneously. Accordingly, the district court did not err by determining that the offenses were not a single course of conduct and properly calculated his criminal-history score to be eight.

**Affirmed.**

13